Williams Law, P.L.L.C.
Matthew C. Williams
P.O. Box 438
Cascade, ID 83611
Phone: (208) 634-9233
Fax:    (208) 361-7982
Email: matt@williamslawoffice.net
ISB No. 6271

Kenneth J. Connelly*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
Phone: (480) 444-0020
Fax:    (480) 444-0028
Email: kconnelly@alliancedefendingfreedom.org
*Seeking pro hac vice admission

Attorneys for Amicus Curiae Cornerstone Family Council of Idaho

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SUSAN LATTA and TRACI EHLERS, LORI WATSEN and SHARENE WATSEN, SHELIA ROBERTSON and ANDREA ALTMAYER, AMBER BEIERLE and RACHAEL ROBERTSON,<br><br>               Plaintiffs,<br><br>   vs.<br><br>C.L. (BUTCH) OTTER, as Governor of the State of Idaho, in his official capacity, and CHRISTOPHER RICH, as Recorder of Ada County, Idaho, in his official capacity,<br><br>               Defendants,<br><br>   and<br><br>STATE OF IDAHO,<br><br>               Intervenor-Defendant. | Case No. 1:13-cv-00482-CWD<br><br>**BRIEF OF AMICUS CURIAE CORNERSTONE FAMILY COUNCIL OF IDAHO IN SUPPORT OF DEFENDANT GOVERNOR C.L. "BUTCH" OTTER'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 57)** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF AMICUS CURIAE ........................................................................... 1

SUMMARY OF ARGUMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 2

I.  This Court Should Not Create "A Federal Intrusion on State Power" or "Disrupt the Federal Balance" by Reading Into the Federal Constitution a Mandate to Redefine Marriage. ........................................................................................ 2

II.  Protecting Federalism is a Compelling Interest that Justifies Non-Interference by the Federal Courts with the State's Sovereign Authority to Define Marriage. ................... 5

A.  Federalism Promotes the Self-Determination of the Citizens of the States. ........... 6

B.  Federalism Promotes Interstate Pluralism with Its Associated Benefits. .............. 7

CONCLUSION ....................................................................................................... 10

CERTIFICATE OF SERVICE ................................................................................ 12

# TABLE OF AUTHORITIES

**Cases**

*Bond v. United States,*
 131 S. Ct. 2355 (2011) ...................................................................................5, 7

*Chandler v. Florida,*
 449 U.S. 560 (1981) ...........................................................................................9

*Citizens for Equal Protection v. Bruning,*
 455 F.3d 859 (8th Cir. 2006) ............................................................................10

*District Attorney's Office for the Third Judicial District v. Osborne,*
 557 U.S. 52 (2009) ..............................................................................................3

*Elk Grove Unified School District v. Newdow,*
 542 U.S. 1 (2004) ................................................................................................3

*Erie R. Co. v. Tompkins,*
 304 U.S. 64 (1938) ..............................................................................................5

*Gregory v. Ashcroft,*
 501 U.S. 452 (1991) ........................................................................................2, 6

*In re Winship,*
 397 U.S. 358 (1970) ............................................................................................6

*Loving v. Virginia,*
 388 U.S. 1 (1967) ................................................................................................4

*Maynard v. Hill,*
 125 U.S. 190 (1888) .......................................................................................7, 10

*Miller v. California,*
 413 U.S. 15 (1973) ..............................................................................................9

*National Federation of Independent Business v. Sebelius,*
 132 S. Ct. 2566 (2012) ........................................................................................3

*New State Ice Co. v. Liebmann,*
 285 U.S. 262 (1932) ............................................................................................8

*Oregon v. Ice,*
 555 U.S. 160 (2009) ............................................................................................8

*San Antonio Independent School District v. Rodriguez,*
 411 U.S. 1 (1973) ................................................................................................8

*Shelby County, Alabama v. Holder,*
   133 S. Ct. 2612 (2013)........................................................................5

*Turner v. Safley,*
   482 U.S. 78 (1987)............................................................................4

*U.S. Term Limits, Inc. v. Thornton,*
   514 U.S. 779 (1995)..........................................................................5

*United States v. Comstock,*
   560 U.S. 126 (2010)..........................................................................3

*United States v. Lopez,*
   514 U.S. 549 (1995)...................................................................6, 7, 8

*United States v. Windsor,*
   133 S. Ct. 2675 (2013)...........................................................1, 2, 3, 4, 7

*Williams v. North Carolina*,
   317 U.S. 287 (1942)........................................................................10

*Zablocki v. Redhail,*
   434 U.S. 374 (1978)..........................................................................4

**Constitutional Provisions**

Idaho Constitution Article III, Section 28...................................................1

**Statutory Provisions**

Idaho Code Section 32-201..................................................................1

Idaho Code Section 32-209..................................................................1

**Other Authorities**

*James Wilson Replies to Findley, Dec. 1, 1787, in* 1 *The Debate on the Constitution*
   (Bernard Bailyn ed., 1993)................................................................2-3

*The Federalist No. 45* (George W. Carey & James McClellan eds., 2001)....................2

John   O.   McGinnis,   *Reviving   Tocqueville's   America:   The   Rehnquist   Court's
   Jurisprudence of Social Discovery*, 90 Cal. L. Rev. 485 (2002) ........................9

James McLellan, *Liberty, Order, and Justice* (3d ed. 2000) ..............................9

Robert F. Nagel, *The Implosion of American Federalism* (2001) ...........................5

Jeffrey L. Rensberger, *Interstate Pluralism: The Role of Federalism in the Same-Sex Marriage Debate,* 2008 BYU L. Rev. 1703 ....................................................................8,9

## INTEREST OF AMICUS CURIAE

Amicus Curiae Cornerstone Family Council of Idaho ("Cornerstone") is a non-partisan, non-profit organization that exists to strengthen families in Idaho through citizen advocacy, education, and principled persuasion.  Cornerstone believes that the traditional family is the essential building block of civilization, and consequently focuses its efforts on public-policy issues implicating marriage, children, education, religious freedom, and constitutional government.  Cornerstone was instrumental in the passage of Idaho's Marriage Amendment, and because it believes that every child deserves both a mom and a dad, it continues to vigorously defend marriage as the union of one man and one woman.

This case questions the constitutionality of Idaho's sovereign decision to preserve marriage as the union between one man and one woman. *See* Idaho Const. art. III, § 28; I.C. §§ 32-201, 32-209 ("Idaho's Marriage Laws").  As a citizen-advocacy organization, Cornerstone's interest in this case derives directly from the important public-policy issues implicated by that sovereign decision, and from the central role in governing the state fulfilled by Idaho's Legislature and People, who overwhelmingly enacted the Idaho Marriage Amendment into law on November 7, 2006

## SUMMARY OF ARGUMENT

A persistent and increasingly popular claim by supporters of same-sex marriage is that the United States Supreme Court's decision in *U.S. v. Windsor*, 133 S. Ct. 2675 (2013), striking down Section 3 of the federal Defense of Marriage Act ("DOMA"), mandates that states like Idaho permit same-sex marriage or recognize same-sex marriages entered into in other states. Nothing could be further from the truth. *Windsor* held only that the federal government may not decline to recognize, for purposes of providing federal benefits, a same-sex marriage previously

recognized by a sovereign state.  *Windsor* does not forbid a state like Idaho from preserving marriage as the union of one man and one woman—to the contrary, the Court's repeated references to our federalist structure, and its repeated assurances that states retain plenary and sovereign power to define marriage within constitutional bounds, only serve to bolster the defense of Idaho's Marriage Laws. Indeed, diverse regulation of marriage and domestic relations is the historic and exclusive province of the individual States. Construing the Federal Constitution in a manner that requires Idaho to redefine marriage would, without constitutional warrant, trample this traditional state power and contravene compelling interests in federalism, state self-determination, and pluralism.

## ARGUMENT

### I.      This Court Should Not Create "A Federal Intrusion on State Power" or "Disrupt the Federal Balance" by Reading Into the Federal Constitution a Mandate to Redefine Marriage.

As the Supreme Court has affirmed, "our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). This constitutional system of federalism rests on two conceptual pillars. First, the powers of the national government are "delegated" rather than inherent. Second, the powers of the States are "reserved." As James Madison explained: "The powers delegated by the proposed Constitution to the federal government, are few and defined. Those which are to remain in the State governments, are numerous and indefinite." *The Federalist No. 45*, at 241 (George W. Carey & James McClellan eds., 2001). This system is founded on the understanding that "the people are the source of authority [and] the consequence is, that they . . . can distribute one portion of power, to the more contracted circle, called state governments: they can also furnish another proportion to the government of the United States." *James Wilson Replies to Findley,*

*Dec. 1, 1787, in* 1 *The Debate on the Constitution* 820 (Bernard Bailyn ed., 1993). "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2577 (2012).

Thus, under our federal system, "the powers reserved to the States consist of the whole, undefined residuum of power remaining after taking account of powers granted to the National Government." *United States v. Comstock*, 560 U.S. 126, 153 (2010) (Kennedy, J., concurring). For this Court to rule that the Federal Constitution mandates that the States redefine marriage would unnecessarily federalize a question that is undoubtedly within the "residuum" of power reserved to the States. As the Supreme Court has noted: "One of the principal areas in which this Court has customarily declined to intervene is the realm of domestic relations." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004). To intervene in state regulation of marriage would "thrust the Federal Judiciary into an area previously left to state courts and legislatures." *Dist. Att'ys Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 73 n.4 (2009). It would create a "federal intrusion on state power" and "disrupt[] the federal balance," *Windsor*, 133 S. Ct. at 2692—without any clear textual support in the Constitution.

As the Supreme Court forcefully reiterated last term: "By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." *Id*. at 2689-2690. The Court noted that "[t]he recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens." *Id*. at 2691. Further, "[t]he definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the protection of offspring, property

interests, and the enforcement of marital responsibilities." *Id.* (quotation marks and alterations omitted).

It has been this way since the beginning: "The significance of state responsibilities for the definition and regulation of marriage dates to the Nation's beginning; for 'when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States.'" *Id.* at 2680-81 (quoting *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383-384 (1930)). "'[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . [and] the Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce.'" *Id.* at 2691 (quoting *Haddock v. Haddock*, 201 U.S. 562, 575 (1906)).

"Consistent with this allocation of authority, the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations." *Id.* Thus, it is a "long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next." *Id.* at 2692.[1] There is no reason for this Court to depart from this "long established precept" by holding that federal courts now have the authority to superintend the domestic relations laws of the States, particularly on an issue—the "definition of marriage"—that is the very "*foundation* of the State's broader authority to regulate the subject of domestic relations." *Id.* at 2691 (emphasis added).

---

[1] The "constitutional guarantees" referenced in *Windsor* are not applicable here, because all cases that have constrained the State's regulation of marriage have involved couples who satisfied the basic definition of marriage within the State, and none of those cases have required a State to change its sovereign definition of marriage to accede to a plaintiff's demands. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967); *Zablocki v. Redhail*, 434 U.S. 374 (1978); *Turner v. Safley*, 482 U.S. 78 (1987).

## II.     Protecting Federalism is a Compelling Interest that Justifies Non-Interference by the Federal Courts with the State's Sovereign Authority to Define Marriage.

Our federal system is premised on the "counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011) (quoting *Alden v. Maine*, 527 U.S. 706, 758 (1999)). As Justice Kennedy has noted, "[t]he Framers split the atom of sovereignty," *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring), and "concluded that allocation of powers between the National Government and the States enhances freedom, first by protecting the integrity of the governments themselves, and second by protecting the people, from whom all governmental powers are derived." *Bond*, 131 S. Ct. at 2364.

Federalism "'preserves the integrity, dignity and residual sovereignty of the States,'" and "secures to citizens the liberties that derive from the diffusion of sovereign power." *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 2623 (2013). This is important because "[w]ithout some degree of sovereign status, states would not have the capacity to act as a 'counterpoise' to federal power." Robert F. Nagel, *The Implosion of American Federalism* 32 (2001). That is why the federal structure "recognizes and preserves the autonomy and independence of the states." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). As the Supreme Court has explained:

> Supervision over either the legislative or the judicial action of the states is in no case permissible except as to matters by the constitution *specifically authorized or delegated* to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the state, and, to that extent, a denial of its independence.

*Id.* at 79 (quoting *Baltimore & O.R. Co. v. Baugh*, 149 U.S. 368, 401 (1893) (Field, J., dissenting)) (emphasis added).

This diffusion of powers ensures that citizens may control their own destiny and that different States may adopt different policies uniquely suited to the desires and aspirations of their people. As the Supreme Court has noted:

> This federalist structure of joint sovereigns preserves to the people numerous advantages. It assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry.

*Gregory*, 501 U.S. at 458.

**A.      Federalism Promotes the Self-Determination of the Citizens of the States.**

The compelling government interest in increasing opportunities for citizen involvement in democratic processes is particularly important in a case like this, where this Court is asked to second-guess a decision arrived at through a process that involved the citizens in their direct and representative capacities. As Justice Black observed, "the right of self-government that our Constitution preserves is just as important as any of the specific individual freedoms preserved in the Bill of Rights." *In re Winship*, 397 U.S. 358, 385 (1970) (Black, J., dissenting).

The federalist "theory that two governments accord more liberty than one," Justice Kennedy has explained, "requires for its realization two distinct and discernible lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States." *United States v. Lopez*, 514 U.S. 549, 576 (1995) (Kennedy, J., concurring). He continued:

> Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory. The resultant inability to hold either branch of the government answerable to the

citizens is more dangerous even than devolving too much authority to the remote central power.

*Id*. at 577 (citations omitted).

The Supreme Court's recent decision striking down the federal Defense of Marriage Act—a federal law that the Court said "departs from this history and tradition of reliance on state law to define marriage"—stresses the important value of political self-determination. *Windsor*, 133 S. Ct. at 2692. In that case, the Court spoke of the New York Legislature's decision to redefine marriage in terms that stressed the importance of citizen involvement: "After a statewide deliberative process that enabled its citizens to discuss and weigh arguments for and against same-sex marriage, New York acted to enlarge the definition of marriage." *Id*. at 2689. The Court remarked that the decision "reflects . . . the community's considered perspective," *id*. at 2692-2693, and that "New York was responding 'to the initiative of those who [sought] a voice in shaping the destiny of their own times.'" *Id*. at 2692 (quoting *Bond*, 131 S. Ct. at 2359). The *Windsor* majority stressed that "[t]he dynamics of state government in the federal system are to allow the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other." *Id*. Clearly, then, the State's democratic decision reflecting the consensus of citizens about a matter as fundamental as the definition of marriage—a social institution "having more to do with the . . . civilization of a people than any other," *Maynard v. Hill*, 125 U.S. 190, 205 (1888)—ought to receive a high degree of respect from this Court.

**B.      Federalism Promotes Interstate Pluralism with Its Associated Benefits.**

Beyond safeguarding local self-government, federalism also advances interstate pluralism. "Interstate pluralism is the feature of our federal system that reflects the ability of each state to establish itself as a distinct community. It entails the ability to make and enforce choices

7

on foundational matters such as fundamental ordering of . . . family relations" and "seeks to protect each state's ability to create and enforce these fundamental orderings and thereby define its society." Jeffrey L. Rensberger, *Interstate Pluralism: The Role of Federalism in the Same-Sex Marriage Debate*, 2008 BYU L. Rev. 1703, 1722-23.

Interstate pluralism allows States to experiment with various social and legal policies free from federal interference and to reflect the unique preference and attributes of the State. As the Supreme Court has "long recognized," the States have an important role "as laboratories for devising solutions to difficult legal problems." *Oregon v. Ice*, 555 U.S. 160, 171 (2009). And as Justice Brandeis famously remarked: "It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). Justice Kennedy similarly explained that "the theory and utility of our federalism are revealed" when "States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *Lopez*, 514 U.S. at 581.

In addition to "experimentation" and "innovation," "[p]luralism also affords some opportunity for . . . a healthy competition" between States. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 50 (1973). It is common in many areas of the law for particular States to be viewed favorably by residents of other States because of the State's approach to a variety of legal issues such as taxation, business regulations, or domestic relations. Since "interstate pluralism allows for state-to-state differentiation, it encourages individuals to relocate to take advantage of a particular social policy, be it low taxes, high employment, a high level of social services, or personal safety." Rensberger, *supra*, at 1739.

8

The Supreme Court has repeatedly emphasized that courts "should not diminish" the States' important role in experimentation and innovation "absent impelling reason to do so." *Oregon*, 555 U.S. at 171. "We are not empowered by the Constitution," the Court has noted, "to oversee or harness state procedural experimentation; only when the state action infringes fundamental guarantees are we authorized to intervene." *Chandler v. Florida*, 449 U.S. 560, 582 (1981).

Affirming federalism does not simply preserve undifferentiated majoritarian rule; rather, as Professor James McLellan notes, federalism protects diversity and "minority rights—the rights of communities or whole regions to maintain their customs, their diversity and individuality, their self-rule." James McLellan, *Liberty, Order, and Justice* 316 (3d ed. 2000). Federalism protects the "different preferences and needs" of different States. John O. McGinnis, *Reviving Tocqueville's America: The Rehnquist Court's Jurisprudence of Social Discovery*, 90 Cal. L. Rev. 485, 510 (2002). Professor Rensberger explains that it is an empirical fact that "in culture, conditions, and social values, the states are fundamentally different from one another." Rensberger, *supra*, at 1792. There is no reason why these differences may not appropriately be reflected in state laws.

In the context of obscenity regulation, for example, "the [Supreme] Court explicitly allowed for diversity within the United States." *Id*. at 1732. In particular, the Court held that "our Nation is simply too big and too diverse for this Court to reasonably expect that [obscenity] standards could be articulated for all 50 States in a single formulation, even assuming the prerequisite consensus exists." *Miller v. California*, 413 U.S. 15, 30 (1973). The Court added that "[p]eople in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity." *Id*. at 33.

While the obscenity example is instructive, the need to protect federalism and foster its resulting benefits is far greater in the context of marriage and domestic relations. This is particularly true given that, as the Supreme Court has recognized, marriage is "the foundation of the family and of society," *Maynard*, 125 U.S. at 211, and that it is "an institution more basic in our civilization than any other." *Williams v. North Carolina*, 317 U.S. 287, 303 (1942). Thus, strangling the diversity of state marriage policies with uniformity imposed by the federal courts is a substantial threat to the values advanced by federalism.

## CONCLUSION

As explained above, compelling government interests in federalism, self-determination, and pluralism urge judicial restraint and deference when considering intrusions on States' autonomous domestic relations decisions. *Cf. Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 867 (8th Cir. 2006) (holding that because "the institution of marriage has always been, in our federal system, the predominant concern of state government," constitutional review "must be particularly deferential" in that context). Accordingly, Cornerstone respectfully requests that this Court **DENY** Plaintiffs' Motion for Summary Judgment (ECF No. 45), and **GRANT** Defendant's Motion for Summary Judgment (ECF No. 57).

Dated: February 25, 2014

Respectfully submitted,


/s/ Matthew C. Williams
Williams Law, P.L.L.C.
Matthew C. Williams
P.O. Box 438
Cascade, ID 83611
Phone: (208) 634-9233
Fax:    (208) 361-7982
Email: matt@williamslawoffice.net
ISB No. 6271

Kenneth J. Connelly*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
Phone: (480) 444-0020
Fax:    (480) 444-0028
Email: kconnelly@alliancedefendingfreedom.org
*Seeking pro hac vice admission

Attorneys for Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Idaho by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Matthew C. Williams
Matthew C. Williams
*Attorney for Amicus Curiae*