UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SUSAN LATTA and TRACI EHLERS, LORI WATSEN and SHARENE WATSEN, SHELIA ROBERTSON and ANDREA ALTMAYER, AMBER BEIERLE and RACHAEL ROBERTSON, | Case No. 1:13-cv-00482-CWD **MEMORANDUM DECISION AND ORDER** |

Plaintiffs,

v.

C.L. "BUTCH" OTTER, as Governor of the State of Idaho, in his official capacity, and CHRISTOPHER RICH, as Recorder of Ada County, Idaho, in his official capacity,

Defendants,

and

STATE OF IDAHO,

Defendant-Intervenor.

## I.    INTRODUCTION

It is precisely because the issue raised by this case touches the heart of what makes individuals what they are that we should be especially sensitive to the rights of those whose choices upset the majority.

— The Honorable Harry Blackmun[1]

---

[1]    *Bowers v. Hardwick*, 478 U.S. 186, 211 (1986) (Blackmun, J., dissenting), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003).

This case asks a basic and enduring question about the essence of American government: Whether the will of the majority, based as it often is on sincere beliefs and democratic consensus, may trump the rights of a minority. Plaintiffs are two same-sex couples who desire to marry in Idaho and two same-sex couples who legally married in other states and wish to have their marriages recognized in Idaho. Under the Constitution and laws of the State of Idaho (Idaho's Marriage Laws), marriage between a man and a woman is the only legally recognized domestic union. Idaho effectively prohibits same-sex marriage and nullifies same-sex marriages legally celebrated in other states. Plaintiffs request the Court declare these laws unconstitutional and enjoin Idaho from enforcing them, which would allow the Unmarried Plaintiffs to marry and the Married Plaintiffs to be legally recognized as married in the state they consider home.

Although 17 states legally recognize same-sex marriages,[2] Idaho is one of many states that has chosen the opposite course. Like courts presiding over similar cases across the country, the Court must examine whether Idaho's chosen course is constitutional. Significantly, the Supreme Court of the United States recently held that the federal government cannot constitutionally define marriage as a legal union between one man and one woman. *United States v. Windsor*, 133 S. Ct. 2675 (2013). Writing for the majority in *Windsor*, Justice Kennedy reasoned the "purpose and effect" of the federal

---

[2]     Six states have legalized same-sex marriage through court decisions (California, Connecticut, Iowa, Massachusetts, New Jersey, and New Mexico); eight have done so through legislation (Delaware, Hawaii, Illinois, Minnesota, New Hampshire, New York, Rhode Island, and Vermont); and three have legalized same-sex marriage by popular vote (Maine, Maryland, and Washington). *See Kitchen v. Herbert*, 961 F.Supp.2d 1181, 1192 n.4 (D. Utah 2013). The District of Columbia also legalized same-sex marriage through legislation. *Id.*

man-woman marriage definition was "to disparage and injure" legally married same-sex couples in derogation of the liberty, due process, and equal protection guaranteed by the Fifth Amendment to the United States Constitution. *Id*. at 2696. Here, the Court considers a related but distinct question: Do Idaho's Marriage Laws deny Plaintiffs the due process or equal protection guaranteed by the Fourteenth Amendment to the United States Constitution?

After careful consideration, the Court finds Idaho's Marriage Laws unconstitutional. This conclusion reaffirms a longstanding maxim underlying our system of government—a state's broad authority to regulate matters of state concern does not include the power to violate an individual's protected constitutional rights. *See, e.g.*, *id*. at 2691 ("State laws defining and regulating marriage, of course, must respect the constitutional rights of persons. . . ."). Idaho's Marriage Laws deny its gay and lesbian citizens the fundamental right to marry and relegate their families to a stigmatized, second-class status without sufficient reason for doing so. These laws do not withstand any applicable level of constitutional scrutiny.

## II.    BACKGROUND

Marriage works a fundamental change on the lives of all who experience it. The decision to marry is both a deeply personal expression of love and a public declaration of commitment. For many, marriage is also a profoundly important religious institution, cementing and celebrating a life-long union enriched by enduring traditions. These traditions vary from faith to faith, but when most people think of marriage they think of the ceremony—the wedding—with all of the hope and joy those pivotal moments entail.

**MEMORANDUM DECISION AND ORDER - 3**

Compared to the immense personal and spiritual significance of marriage as a ceremonial rite, the civil institution of marriage is much more prosaic.

## A.     Idaho's Marriage Laws

A series of licensing statutes govern civil marriage in Idaho. As far as the State is concerned, marriage is a contract evidenced by a State-issued license and a solemnization. Idaho Code § 32-201(1). The solemnization itself can be secular or religious, and the officiant need not be an ordained minister. *Id*. §§ 32-303 to -304. Regardless of their preferred method of solemnization, opposite-sex couples are eligible for a marriage license so long as they meet certain minimal requirements. *See id.* §§ 32-202 (age limitations); -205, -206 (consanguinity limitations); -207 (prohibition of polygamous marriages).

A multitude of legal benefits and responsibilities flow from a valid civil marriage contract. These marital benefits include the right to be recognized as a spouse when petitioning to adopt a child born to a spouse, *see id.* §§ 16-1503, -1506; have access to an ill spouse at the hospital and to make medical decisions for an ill or incapacitated spouse without a written power of attorney, *see id.* § 39-4504; file a joint state income tax return as a married couple, *see id.* § 63-3031; inherit a share of the estate of a spouse who dies without a will, *see id.* § 15-2-102; preclude a spouse from testifying in a court proceeding about confidential communications made during the marriage, *see id.* § 9-203; and jointly own community property with right of survivorship, *see id.* § 15-6-401. These incidents of marriage touch every aspect of a person's life. From the deathbed to the tax form, property rights to parental rights, the witness stand to the probate court, the legal status of

"spouse" provides unique and undeniably important protections. Opposite-sex married couples enjoy many of these benefits by automatic operation of law.

A couple need not marry in Idaho to enjoy these benefits, as Idaho generally follows the so-called "place of celebration rule." *See Morrison v. Sunshine Mining Co.*, 127 P.2d 766, 769 (Idaho 1942) ("Having assumed and entered into the marital relation with appellant in Montana, the status thus established followed Morrison to Idaho and could not be shed like a garment on entering this state."). Under this longstanding rule, a marriage contracted outside Idaho will be valid in Idaho if the marriage is valid where contracted. *See* Idaho Code § 32-209. That is, unless the marriage is between two persons of the same sex. *Id.*

Same-sex couples are categorically prohibited from obtaining a marriage license in Idaho or from having their otherwise valid out-of-state marriages recognized in Idaho. But for the fact they are same-sex couples, Plaintiffs would either be recognized as married or be eligible to marry.

Plaintiffs challenge three specific provisions of Idaho law.[3] First, Idaho Code § 32-201 defines marriage as "a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making it is necessary." *Id.*

---

[3]    The Idaho Code is replete with provisions referencing "husband and wife" or the traditional, opposite-sex definition of marriage. *See, e.g., id.* §§ 32-202 (referring to "the male" and "the female" parties to a marriage contract); 32-304 (requiring couple to declare they "take each other as husband and wife"); 32-901 to -929 (relating to "Husband and Wife – Separate and Community Property"). The Court need not survey these scattered provisions because, as discussed in Part II.D below, Plaintiffs' requested relief is broad enough to cover any source of Idaho law that would prohibit or refuse to recognize same-sex marriages, wherever contracted.

§ 32-201(1). This statute prohibits same-sex marriage regardless of whether a couple otherwise qualifies for a marriage license.

Second, Idaho Code § 32-209 provides the mechanism by which Idaho recognizes the legal validity of marriages contracted in other states or countries. The statute provides:

> All marriages contracted without this state, which would be valid by the laws of the state or country in which the same were contracted, are valid in this state, unless they violate the public policy of this state. Marriages that violate the public policy of this state include, but are not limited to, same-sex marriages, and marriages entered into under the laws of another state or country with the intent to evade the prohibitions of the marriage laws of this state.

*Id.* § 32-209. This statute creates a two-tiered system for out-of-state marriages. While opposite-sex couples benefit from the place of celebration rule, married same-sex couples shed their marital status upon entering Idaho. Although the State's non-recognition policy is not limited to same-sex marriages and marriages contracted with the intent to evade Idaho law, the statute lists no other form of marriage specifically.

Third, the Idaho Constitution effectively bans legal recognition of same-sex unions. In November of 2006, a majority of Idaho's electorate voted to add the following language to the Idaho Constitution: "A marriage between a man and a woman is the only domestic legal union that shall be valid or recognized in this state." Idaho Const. Art. III, § 28.

This provision has the combined legal effect of the two statutes referenced above. But, by virtue of its place in the Idaho Constitution, the amendment imposes powerful restraints on Idaho's Legislature and Judiciary. The provision effectively precludes a state

court from finding that Idaho law requires the State to recognize any type of same-sex union. And it precludes every legislative body in Idaho from recognizing civil unions or any other same-sex relationship approximating marriage. Absent a superseding constitutional amendment, no branch of state government may authorize or recognize the marriage of two persons of the same sex. Thus, Idaho's Marriage Laws prevent same-sex couples, whether married or unmarried, from obtaining the marital status and benefits afforded to opposite-sex couples.

## B.    The Plaintiffs

Plaintiffs are four same-sex couples. The Married Plaintiffs, Susan Latta and Traci Ehlers, and Lori Watsen and Sharene Watsen, legally married in other states and wish to have their marriages recognized in Idaho. The Unmarried Plaintiffs, Shelia Robertson and Andrea Altmayer, and Amber Beierle and Rachael Robertson, desire to be married in Idaho, but the County Recorder of Ada County, Defendant Rich, denied their marriage license applications. The following undisputed facts are contained in the pleadings and in Plaintiffs' declarations.

### 1.    *Susan Latta and Traci Ehlers*

Susan Latta has lived in Boise for 22 years. Traci Ehlers has resided in Idaho's Treasure Valley for 38 years. Latta is a professional artist and adjunct professor at Boise State University, and Ehlers owns a small business in Boise. They met at a book club and began dating in 2003. Ehlers proposed to Latta in 2004, and, in 2006, the couple celebrated "a meaningful but not legally binding wedding ceremony in Boise." (Latta Dec. ¶ 11, Dkt. 48.) In 2008, the couple legally married in California soon after that state

began allowing same-sex marriages. Neither Latta nor Ehlers had been married before, but they decided to marry because they wanted to spend the rest of their lives together. Although Ehlers never thought she would have children, she is now step-mother to Latta's children and step-grandmother to Latta's grandchildren.

Both Latta and Ehlers attest that Idaho's refusal to recognize their marriage complicates and demeans their lives. They worry about the ramifications of aging without a legally recognized marriage, a reality that implicates taxes, inheritance, Social Security benefits, hospital visitation rights, and medical decision-making. Although they can file a "married" tax return for federal purposes, Idaho law requires them to file "single" state tax returns. Latta and Ehlers plan to seek professional assistance to prepare their state tax returns. The couple also is unsure about the status of property they acquired during their marriage because a quitclaim deed purporting to grant each of them title to community property with right of survivorship may not be enforceable absent a legally recognized marriage. Ehlers explains, "it is painful that the state we love, the place that we have made our home, where we vote and pay taxes, where we have our businesses, where we participate, and volunteer, and donate, treats us as second-class citizens." (Ehlers Dec. ¶ 18, Dkt. 49.)

### 2.  *Lori Watsen and Sharene Watsen*

Lori and Sharene Watsen reside in Boise, where Sharene works as a physician assistant and Lori works as a social worker. Friends introduced the Watsens in 2009, and the two have been together as a couple since their first date. In 2011, the couple married in a small legal ceremony in New York. They held a larger celebration of their marriage

at their church in Boise during the summer of 2012. The Watsens both describe their marriage as an important symbol of their love for and commitment to each other, not least because they both grew up in deeply religious families that value the institution greatly.

Also in 2012, the Watsens decided to start a family. Their son was conceived by artificial insemination in September 2012, and Sharene gave birth in May 2013. Although they requested that Lori be listed as their son's parent, his birth certificate lists only Sharene. In the summer of 2013, the Watsens hired an attorney to assist Lori's adoption of their son. An Ada County magistrate judge dismissed the adoption petition and, despite their valid New York marriage, deemed Lori to be Sharene's unmarried "cohabitating, committed partner" without legal standing to adopt Sharene's son. (S. Watsen Dec. Ex. C., Dkt. 51-3 at 5.) The couple felt demeaned by the magistrate judge's decision, and Lori plans to again petition for adoption.[4]

Like Latta and Ehlers, the Watsens are concerned about the many complications Idaho's Marriage Laws add to their family life. Lori Watsen must create a new medical power of attorney every six months, for, without one, she cannot consent to medical treatment for her son. In addition, the Watsens have the same tax and community property problems as Latta and Ehlers. Above all, Lori Watsen wants their "son to have

---

[4]     After the dismissal of Lori Watsen's adoption petition, the Idaho Supreme Court held "Idaho's adoption statutes plainly allow" a woman to adopt her same-sex partner's children. *In re Adoption of Doe*, —P.3d—, 2014 WL 527144, at *6 (Idaho Feb. 10, 2014). The court made clear it would not "imply . . . restrictions based on Idaho's marital statutes" and that "sexual orientation was wholly irrelevant to our analysis." *Id*.

**MEMORANDUM DECISION AND ORDER - 9**

the same pride in us, as his parents, that I feel for my parents, who have been married for 50 years." (L. Watsen Dec. ¶ 36, Dkt. 50.)

### 3. *Shelia Robertson and Andrea Altmayer*

Shelia Robertson and Andrea Altmayer live together in Boise. Altmayer works as a massage therapist. Robertson, who has advanced training in communicative disorders, teaches deaf students at a local school district and works part-time as a video relay interpreter.

The two have been in a committed, exclusive relationship since friends introduced them 16 years ago. If Idaho allowed same-sex marriages, they would have married years ago. Although the couple considered marrying outside Idaho, they did not wish to incur the expense of traveling away from their family and friends only to return home with a marriage not recognized in Idaho. Even so, Robertson and Altmayer decided to start a family. Altmayer became pregnant through artificial insemination and gave birth to their son in 2009.

Similar to the Watsens' experience, Robertson and Altmayer completed birth certificate forms identifying Altmayer as the mother and Robertson as a parent. But the birth certificate lists only Altmayer as their son's parent. The lack of a legally recognized parental relationship between Robertson and her son means she cannot consent to medical treatment for him and otherwise prevents the couple from equally sharing numerous parental responsibilities. Robertson and Altmayer worry their son will not have the security and stability afforded by two legal parents. Both are deeply concerned their

son will grow up believing there is something wrong with his family because his parents cannot marry.

On November 6, 2013, Robertson and Altmayer submitted a marriage license application to the Ada County Recorder. The application was denied only because Robertson and Altmayer are both women. Demeaned but undeterred by this experience, the couple wishes to be married "so that other people understand that we are a family, in a permanent life-long relationship." (S. Robertson Dec. ¶ 15, Dkt. 53.)

### 4.   *Amber Beierle and Rachael Robertson*

Amber Beierle and Rachael Robertson both grew up, reside, and wish to marry in Idaho. Beierle holds a M.S. in Applied Historical Research and works for the Idaho State Historical Society. Roberston is an Army veteran, having served a tour of duty in Iraq from June 2004 to November 2005. During her military service, Robertson earned the Army Combat Medal and the Soldier Good Conduct Medal. She was honorably discharged from the Army in 2008 and now manages a warehouse in Boise.

Beierle and Robertson met in 2006 and began dating in 2010. The two have been in a committed, exclusive relationship since Valentine's Day, 2011. They bought a house together in December of 2012. The couple plans to raise children, but they worry their children will grow up thinking something is wrong with their family because Beierle and Robertson cannot marry. Although they considered marrying in another state, they wish to be married in their home state of Idaho. And, even if they were married in another state, Idaho law would prevent them from being buried together at the Idaho Veterans Cemetery because they are a same-sex couple.

Beierle and Robertson also applied for a marriage license on November 6, 2013. Although they otherwise qualify for a marriage license, the Ada County Recorder's Office denied the application because they are both women. This experience demeaned Beierle and Robertson. They "want to have the same freedom as opposite-sex couples to marry the person [they] love and to share the benefits and responsibilities of marriage and in the recognition and protections of marriage." (Beierle Dec. ¶ 19, Dkt. 54.)

## C.     The Defendants

Defendant C.L. "Butch" Otter is the Governor of the State of Idaho. He is sued in his official capacity. As Governor, Defendant Otter is responsible for upholding and ensuring compliance with the Idaho Constitution and statutes enacted by the Legislature, including the marriage laws at issue in this case. *See* Idaho Const. Art. IV, § 5 ("The supreme executive power of the state is vested in the governor, who shall see that the laws are faithfully executed.").

Defendant Christopher Rich is Recorder of Ada County, Idaho. He is sued in his official capacity. As the Ada County Recorder, Defendant Rich has "the authority to issue marriage licenses to any party applying for the same who may be entitled under the laws of this state to contract matrimony." Idaho Code § 32-401. On November 6, 2013, an authorized deputy of Defendant Rich denied the Unmarried Plaintiffs' applications for marriage licenses because, as same-sex couples, they were not entitled to contract matrimony in Idaho.

Early in this case, the State of Idaho moved and was permitted to intervene as a defendant. (Dkt. 38.) The State, by and through the Idaho Attorney General, asserts a

**MEMORANDUM DECISION AND ORDER - 12**

strong, independent interest in defending Idaho's laws against constitutional attack. Throughout this litigation, the State has joined in Recorder Rich's motions and briefing.

## D.   Requested Relief

Plaintiffs bring suit under 42 U.S.C. § 1983, alleging that Governor Otter and Recorder Rich acted in their official capacities and under color of law to deprive them of rights protected by the Fourteenth Amendment to the United States Constitution.[5] They request a declaration that all Idaho laws prohibiting same-sex marriage or barring recognition of valid out-of-state same-sex marriages violate the due process and equal protection guarantees in the Fourteenth Amendment. They also request a permanent injunction against enforcement of any Idaho law that would prohibit or withhold recognition of same-sex marriages. These claims constitute a facial constitutional attack on the validity of any Idaho law that prohibits same-sex marriage in Idaho or withholds recognition of same-sex marriages validly contracted in another state.[6]

## III.   STANDARD OF REVIEW

The parties seek judicial resolution of this case via three motions: Defendant Recorder Rich and Defendant-Intervenor Idaho's motion to dismiss for failure to state a

---

[5]      There is no dispute that Plaintiffs have standing to bring this lawsuit or, considering the relief requested, that Defendants are proper parties.

[6]      The undersigned United States Magistrate Judge has jurisdiction over this matter by virtue of all parties' express written consent. 28 U.S.C. § 636(c); *see also* D. Idaho Loc. Civ. R. 72.1(a)(1) (authorization to decide civil cases with the parties' consent), (Dkt. 40) (consents).

claim (Dkt. 43)[7], Plaintiffs' motion for summary judgment (Dkt. 45), and Defendant Governor Otter's motion for summary judgment (Dkt. 57). Typically, motions to dismiss are evaluated under different standards than motions for summary judgment. But here, the motion to dismiss must be treated as a motion for summary judgment.

Recorder Rich and Defendant-Intervenor Idaho's motion to dismiss attaches and references numerous documents outside the pleadings. These documents include five articles on marriage and parenting. (Dkt. 30-6 to -10.) The parties vigorously dispute the meaning and import of the sociological literature on these points. Because the Court considered the literature submitted with the motion to dismiss, the motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d); *see also Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 921-22 (9th Cir. 2004) (finding a represented party's submission of extra-pleading materials justified treating motion to dismiss as motion for summary judgment). The Court will evaluate all pending motions under the summary judgment standard.

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When parties submit cross-motions for summary judgment, "the court must review the evidence submitted in support of each cross-motion" and decide each on its

---

[7]     Recorder Rich first moved to dismiss this case on January 9, 2014. (Dkt. 30.) After the Court permitted the State to intervene, the State filed a motion to dismiss that adopted all arguments made in Recorder Rich's initial motion. (Dkt. 41.) Plaintiffs thereafter filed an Amended Complaint, (Dkt. 42), which Recorder Rich and the State jointly moved to dismiss based on the reasons stated in their earlier motions to dismiss. (Dkt. 43.)

own merits. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## IV.    ANALYSIS

The Court has considered the parties' briefs and supporting materials, as well as oral arguments presented during a May 5, 2014 hearing on all dispositive motions. As a preliminary matter, the Court finds the Supreme Court's summary decision in *Baker v. Nelson*, 409 U.S. 810 (1972), does not prevent lower federal courts from deciding the constitutional issues in this case. With respect to Plaintiffs' due process claim, Idaho's Marriage Laws are subject to strict scrutiny because they infringe upon Plaintiffs' fundamental right to marry. Under the Equal Protection Clause, Idaho's Marriage Laws are subject to heightened scrutiny because they intentionally discriminate on the basis of sexual orientation. The Court finds that Idaho's Marriage Laws do not survive any applicable level of constitutional scrutiny and therefore violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. The reasons for these findings are discussed below.

## A.    *Baker v. Nelson*

Defendants initially argue that *Baker v. Nelson* is binding precedent that shields Idaho's Marriage Laws from constitutional attack. *Baker* was an appeal to the United States Supreme Court from a decision of the Supreme Court of Minnesota. The Minnesota court held that neither Minnesota law nor the United States Constitution required the issuance of marriage licenses to a same-sex couple. *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed*, 409 U.S. 810 (1972). Based on a brief

review of then-existing due process and equal protection jurisprudence, the Minnesota court rejected the plaintiffs' due process and equal protection claims. On appeal, the Supreme Court summarily dismissed the case "for want of a substantial federal question." *Baker*, 409 U.S. at 810.

Summary dismissals have real but narrow precedential value. "A summary disposition affirms only the judgment of the court below, and no more may be read into [the] action than was essential to sustain the judgment." *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182-83 (1979) (citations omitted). The dismissal "prevent[s] lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided" in the action. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). When a case raises the precise issue addressed by a summary dismissal, "the lower courts are bound . . . until such time as the [Supreme] Court informs them that they are not." *Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975) (quotation omitted). Defendants correctly note that *Baker* necessarily decided the precise issues presented in this case and that the Supreme Court has not expressly overruled *Baker* in the four decades after it was summarily decided.

Although *Baker* speaks to the precise issues presented in this case, there is good reason to find its guidance no longer binding. The Supreme Court has instructed that "inferior federal courts had best adhere to the view that if the Court has branded a question as insubstantial, it remains so *except when doctrinal developments indicate otherwise*." *Hicks*, 422 U.S. at 344 (emphasis added). Defendants make forceful arguments about the binding nature of summary dismissals, but they overlook the

doctrinal developments exception stated in *Hicks*. In fact, Defendants cite only one case

that analyzes the doctrinal developments since *Baker*, and that case was decided before

*Windsor. See Jackson v. Abercrombie*, 884 F.Supp.2d 1065, 1085-86 (D. Haw. 2012)

(concluding pre-*Windsor* doctrinal developments did not overcome *Baker*). The Supreme

Court's due process and equal protection jurisprudence has developed significantly in the

four decades after *Baker*, and, in last year's *Windsor* decision, the Court dramatically

changed tone with regard to laws that withhold marriage benefits from same-sex couples.

In 1972, the Supreme Court had not recognized gender as a quasi-suspect

classification. *See Frontiero v. Richardson*, 411 U.S. 677 (1973).[8] Nor had the Court

applied heightened equal protection scrutiny to gender-based classifications. *See Craig v.

Boren*, 429 U.S. 190 (1976). It was not until 1996 that the Supreme Court recognized

laws based on a "'bare . . . desire to harm'" homosexuals were not rationally related to

any legitimate government interest. *Romer v. Evans*, 517 U.S. 620 (1996) (quoting *U.S.

Dept. of Agric. v. Moreno*, 413 U.S. 528 (1973)). Since *Baker*, the Supreme Court's equal

protection jurisprudence has expanded, scrutinizing both gender and sexual orientation

discrimination in more exacting ways.

In 1972, states could constitutionally criminalize private, consensual sex between

adults of the same sex based on nothing more than moral disapproval of the homosexual

---

[8]     November 22, 1971—less than a year before the summary decision in *Baker*—was the
first time the Supreme Court struck down a law because it unconstitutionally discriminated on
the basis of gender. *Reed v. Reed*, 404 U.S. 71 (1971).  Overruling the Idaho Supreme Court,
*Reed* held that Idaho's statutory preference for male estate administrators was "the very kind of
arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth
Amendment. . . ." *Id*. at 76.

**MEMORANDUM DECISION AND ORDER - 17**

lifestyle. *See Bowers v. Hardwick*, 478 U.S. 186 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003). But, just 11 years ago, the Court reversed course and held the government could not lawfully "demean [homosexuals'] existence or control their destiny by making their private sexual conduct a crime." *Lawrence*, 539 U.S. at 574. *Lawrence* reaffirmed that the Due Process Clause protects fundamental rights of personhood, definitively establishing that individuals do not forfeit their rights because of their sexual orientation. *Id*. At the very least, *Romer* and *Lawrence* strongly suggest that state-approved discrimination based on sexual orientation is now a substantial federal question.

Although courts formerly were reluctant to find these developments sufficient to overcome *Baker*, *e.g.*, *Jackson*, 884 F.Supp.2d at 1085-86, much has changed in just the last year. In June of 2013, the Supreme Court struck down the federal man-woman definition of marriage because, when applied to legally married same-sex couples, it "demean[ed] the couple, whose moral and sexual choices the Constitution protects." *Windsor,* 133 S. Ct. at 2694. In doing so, the Supreme Court affirmed the decision of the United States Court of Appeals for the Second Circuit, which expressly held that *Baker* did not foreclose review of the federal marriage definition. *Windsor v. United States*, 699 F.3d 169, 178-80 (2d Cir. 2012) ("Even if *Baker* might have had resonance . . . in 1971, it does not today."). Also last summer, the Supreme Court declined to review a decision invalidating California's voter-approved man-woman marriage definition. *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013). The Supreme Court dismissed the appeal not because *Baker* rendered the question insubstantial, but because the law's supporters lacked standing to defend it after the State of California decided not to. These are doctrinal

developments sufficient to overcome the narrow precedential effect of a summary dismissal.

Since *Windsor*, no federal court has ruled to the contrary. In fact, every court to consider *Baker* in the context of a post-*Windsor* challenge to laws against same-sex marriage has found that doctrinal developments since 1972 provide ample reason to reach the merits. *Kitchen v. Herbert*, 961 F.Supp.2d 1181, 1194-95 (D. Utah 2013); *Bishop v. U.S.*, 962 F.Supp.2d 1252 (N.D. Okla. 2014); *Bostic v. Rainey*, 970 F.Supp.2d 456, 468-70 (E.D. Va. 2014); *McGee v. Cole*, —F.Supp.2d—, 2014 WL 321122 at *8-10 (S.D. W.Va. Jan. 29, 2014); *Bourke v. Beshear*, —F.Supp.2d—, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014); *De Leon v. Perry*, —F.Supp.2d—, 2014 WL 715741, at *8-10 (W.D. Tex. Feb. 26, 2014); *DeBoer v. Snyder*, —F.Supp.2d—, 2014 WL 1100794, at * 15 n.6 (E.D. Mich. Mar. 21, 2014). Consistent with the findings of its sister courts, the Court concludes that *Baker* is not controlling and does not bar review of Plaintiffs' claims.

**B.    Due Process**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees fair process and places substantive limits on the States' authority to constrain individual liberty. Many of our most cherished liberties originate in the Bill of Rights—among them the freedoms of speech, press, and religion; the right to be free from unreasonable searches and seizures; and the right to just compensation when the government takes private property. Initially, the Bill of Rights guarded against only actions by the federal government. But, upon the adoption of the Fourteenth Amendment, a more comprehensive protection came into force: "No State shall make or enforce any

law which shall abridge the privileges and immunities of citizens of the United States;

nor shall any State deprive a person of life, liberty, or property, without due process of

law; nor deny to any person the equal protection of the laws." U.S. Const. amend. XIV,

§ 1. Now, most of the Bill of Rights applies to the states by virtue of the Fourteenth

Amendment. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3034-36, 3050 (2010)

(chronicling "selective incorporation" of the Bill of Rights and incorporating the Second

Amendment).

The Supreme Court also has recognized that the liberty guaranteed by the

Fourteenth Amendment extends beyond the Bill of Rights to "the right to define one's

own concept of existence, of meaning, of the universe, and of the mystery of human life.

Beliefs about these matters could not define the attributes of personhood were they

formed under the compulsion of the State." *Planned Parenthood of Se. Pa. v. Casey*, 505

U.S. 833, 851 (1992).

An individual's protected liberties include certain fundamental rights of

personhood. These rights center on the most significant decisions of a lifetime—whom to

marry, whether to have children, and how to raise and educate children. *Lawrence*, 539

U.S. at 574. These choices are protected because they implicate "associational rights . . .

'of basic importance in our society,' rights sheltered by the Fourteenth Amendment

against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519

U.S. 102, 116 (1996) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 376 (1971)).

Ordinarily, laws do not offend the Due Process Clause when they are rationally

related to a legitimate government interest. *Washington v. Glucksburg*, 521 U.S. 702, 722

**MEMORANDUM DECISION AND ORDER - 20**

(1997). But laws that implicate fundamental rights are subject to strict scrutiny, surviving only if narrowly tailored to a compelling government interest. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). The essential issue for due process purposes is whether Idaho's Marriage Laws infringe on Plaintiffs' fundamental rights.

The decisions of the United States Supreme Court "confirm that the right to marry is of fundamental importance for all individuals." *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978). "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men" and women. *Loving v. Virginia*, 388 U.S. 1, 11 (1967). "It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

Against this background, Plaintiffs wish to exercise their fundamental right to marry. Defendants acknowledge that the fundamental right to marry exists, but they argue it does not extend to same-sex couples. Rather, Defendants contend Plaintiffs seek recognition of a new fundamental right, the right to same-sex marriage.

Defendants appropriately note that the Supreme Court has explicitly cautioned against finding new fundamental rights. "[T]he Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksburg*, 521 U.S. at 720-21 (quotations and citations omitted). A "careful description" of the newly asserted liberty interest also is necessary. *Id.* at 721. Moreover, the "Nation's history, legal

**MEMORANDUM DECISION AND ORDER - 21**

traditions, and practices . . . provide the crucial guideposts for responsible decisionmaking, that direct and restrain [the Court's] exposition of the Due Process Clause." *Id*. (quotation and citation omitted).

The *Glucksberg* decision is instructive on how the Supreme Court evaluates new fundamental rights. There, the plaintiffs asserted the State of Washington's ban on causing or aiding another person's suicide violated a constitutionally protected right to choose the manner of one's own death. The Supreme Court surveyed the history of the law regarding suicide, concluding "[t]he history of the law's treatment of assisted suicide in this country has been and continues to be one of the rejection of nearly all efforts to permit it." *Id*. at 728. Given this largely unbroken tradition, the Court declined to recognize a new constitutionally protected right to suicide or assisted suicide. The Supreme Court then upheld Washington's assisted suicide ban because the ban rationally related to Washington's legitimate interest in preserving human life.

The restraint exercised in *Glucksberg* is not warranted here. Although marriage is not mentioned in the Bill of Rights, the Supreme Court has uniformly treated marriage as an established fundamental right. A long line of cases recognize marriage as a fundamental right, variously describing it as a right of liberty, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), of privacy, *Griswold*, 381 U.S. at 486, and of association, *M.L.B.*, 519 U.S. at 116. This exalted status among personal rights is based on the recognition that marriage "involv[es] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy. . . ." *Casey*, 505 U.S. at 851.

**MEMORANDUM DECISION AND ORDER - 22**

In fact, *Glucksburg* cites the right to marry as one of the well-established fundamental rights. 521 U.S. at 720.

Because the right to marry is fundamental, the Supreme Court has repeatedly invalidated laws that infringe upon it. In the pathmarking case of *Loving v. Virginia*, our Nation's highest court found unconstitutional a Virginia statute banning interracial marriages. 388 U.S. 1 (1967). Similar to the Idaho Marriage Laws challenged here, Virginia's anti-miscegenation laws prohibited the issuance of marriage licenses to interracial couples and further forbade attempts to evade the ban by marrying out-of-state. *Loving*, 388 U.S. at 4-6. Violation of these Virginia's law was a criminal offense punishable by imprisonment for up to five years. *Id*. at 5. Regardless of the historical precedent for such laws, the Supreme Court made clear that "the freedom to marry or not marry[] a person of another race resides with the individual and cannot be infringed by the State." *Id*. at 12.

The Supreme Court reaffirmed the fundamental and individual character of the right to marry in *Zablocki v. Redhail*. There, the Court reviewed a Wisconsin law that required residents to seek court permission to marry if a Wisconsin resident had children not in the resident's custody. *Zablocki*, 434 U.S. at 375. Under that law, permission to marry would be granted only if the resident could show full compliance with any child-support obligations and further demonstrate children covered by a support order were "not then and [were] not likely thereafter to become public charges." *Id*. (quoting Wis. Stat. § 245.10 (1973)). Despite the State's interest in child welfare, the Supreme Court invalidated the statute because it "unnecessarily impinge[d] on the right to marry" in a

context where Wisconsin had "numerous other means" for advancing its interest. *Id.* at 388-89.

Next, in 1987, the Supreme Court struck down a Missouri prison regulation that restricted inmates' right to marry. *Turner v. Safley*, 482 U.S. 78 (1987). Under the regulation, an inmate could marry only with approval from the superintendent of prisons, permission that would be granted under "compelling" circumstances such as pregnancy or the birth of an illegitimate child. *Id.* at 82. While prisoners are subject to a variety of restrictions on their constitutional liberties, the Court found that "[m]any important attributes of marriage remain, however, after taking into account the limitations imposed by prison life." *Id.* at 95. Recognizing the emotional, public, and spiritual significance of marriage, as well as the many government benefits that flow from marital status, the Court struck down the prison regulation. According to the Supreme Court, "these incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate penological objectives." *Id.* at 95-96.

More recently, the Supreme Court confirmed that gay and lesbian individuals do not forfeit their constitutional liberties simply because of their sexual orientation. *Lawrence*, 539 U.S. 558. The Court observed that "our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." *Id.* at 574. Emphasizing that these are personal rights, the Court concluded "[p]ersons in a homosexual relationship may seek autonomy for these purposes, *just as heterosexual*

*persons do*." *Id.* (emphasis added). And, less than one year ago, the Supreme Court struck down the federal Defense of Marriage Act's man-woman definition of marriage because it amounted to unconstitutional "interference with the equal dignity of same-sex marriages" recognized by some states. *Windsor*, 133 S. Ct. at 2693. The message of these cases is unmistakable—all individuals have a fundamental right to marry.

Defendants argue these cases do not apply here because the Supreme Court has recognized a fundamental right to only heterosexual marriage. Relying on *Glucksburg*, the Defendants characterize this case as one involving the "right to same-sex marriage," a right lacking both historical precedent and constitutional protection. Defendants' argument suffers from three critical flaws.

This "new right" argument attempts to narrowly parse a right that the Supreme Court has framed in remarkably broad terms. *Loving* was no more about the "right to interracial marriage" than *Turner* was about the "prisoner's right to marry" or *Zablocki* was about the "dead-beat dad's right to marry." Even in cases with such vastly different facts, the Supreme Court has consistently upheld the right to marry, as opposed to a sub-right tied to the facts of the case. While *Glucksburg* demands that new rights be carefully described and deeply rooted, the cases above demonstrate that the Supreme Court has long recognized an unembellished right to marry.

On the other hand, the holding in *Glucksburg* followed directly from the unbroken pattern of state laws and legal traditions disapproving suicide and assisted suicide. 521 U.S. at 710-11 ("Indeed, opposition to and condemnation of suicide—and, therefore, assisting suicide—are consistent and enduring themes of our philosophical, legal, and

**MEMORANDUM DECISION AND ORDER - 25**

cultural heritages."). Given that context, it was a truly novel proposition to say that the concept of "liberty" substantively protects a person's freedom to end his or her life. Finding the policy of condemning and discouraging suicide both deeply rooted and nearly universal in contemporary society, the Court declined to recognize a new fundamental right. *Id.* at 728.

The context here is dramatically different. Far from a uniform pattern of laws rejecting the practice, a fast-growing number of states now recognize that same-sex and opposite-sex marriages are equal. And, while *Glucksburg* makes much of the consistent legal, medical, and social policies against suicide, the Court is not aware of a similarly pervasive policy against marriage. To the contrary, the Defendants make abundantly clear that marriage is a life-affirming institution—something to be encouraged because it provides stability not only for couples, but also for children.

Finally, and most critically, the Supreme Court's marriage cases demonstrate that the right to marry is an individual right, belonging to all. *See Lawrence*, 539 U.S. at 574. If every individual enjoys a constitutional right to marry, what is the substance of that right for gay or lesbian individuals who cannot marry their partners of choice? Traditional man-woman marriage is no answer, as this would suggest that gays and lesbians can switch off their sexual orientation and choose to be content with the universe of opposite-sex partners approved by the State.[9] Defendants offer no other answer.

---

[9] "No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation." *Perry v. Schwarzenegger*, 704 F.Supp.2d 921, 966 (N.D. Cal. 2010); *see also Hernandez-Montiel* (Continued)

In their effort to avoid the question, Defendants commit the same analytical mistake as the majority in *Bowers v. Hardwick*, the decision that declined to "announce a fundamental right to engage in homosexual sodomy." 478 U.S. 186, 191 (1986), *overruled by Lawrence*, 539 U.S. at 577. The crucial mistake in *Bowers* was that the majority narrowed and thus "fail[ed] to appreciate the extent of the liberty at stake." *Lawrence*, 539 U.S. at 567. For that reason, the Supreme Court in *Lawrence* concluded "*Bowers* was not correct when it was decided, and it is not correct today." *Id.* at 577. *Lawrence* instructs not only that gay and lesbian individuals enjoy the same fundamental rights to make intimate personal choices as heterosexual individuals enjoy, but that judicial attempts to parse those rights out of existence will be met with a harsh rebuke.

The Supreme Court's marriage cases recognize an individual's fundamental right to marry. The right transcends one's race, confinement to prison, or ability to support children. *Lawrence* unequivocally cements marriage as among the constitutionally protected liberties shared by homosexual and heterosexual persons alike. The teaching of these cases is that the fundamental right to marry cannot be narrowed in the manner Defendants urge. Idaho's Marriage Laws render the Plaintiff couples legal strangers, stripping them of the choice to marry or remain married in the state they call home.

---

*v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (reviewing literature on the essential link between sexual and personal identity).

Therefore, Idaho's Marriage Laws impermissibly infringe on Plaintiffs' fundamental right to marry.[10]

## C.    Equal Protection

Plaintiffs also claim Idaho's Marriage Laws violate the Equal Protection Clause of the Fourteenth Amendment. That clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const., amend XIV., § 1). The equal protection guarantee is in tension with the reality that laws almost inevitably draw lines between groups of people, advantaging some and disadvantaging others. *Romer v. Evans*, 517 U.S. 620, 631 (1996). The Supreme Court has developed tiers of judicial scrutiny in an effort to reconcile this practical reality with the constitutional principle. The level of scrutiny depends on the characteristics of the disadvantaged group or the rights implicated by the classification.

A law that neither targets a suspect class nor burdens a fundamental right is subject to rational basis scrutiny. *Heller v Doe*, 509 U.S. 312, 319-21 (1993). The Court in such cases presumes the law is valid unless the challenger can show the difference in treatment bears no rational relation to a conceivable government interest. *Id*. "A classification does not fail rational-basis review because it 'is not made with

---

[10]    For this reason, Idaho's Marriage Laws are subject to strict due process and equal protection scrutiny.  *See Zablocki*, 434 U.S. at 388. But the Laws do not survive under the lower level of equal protection scrutiny applied in Part IV.D below. Consequently, the Laws would fail strict scrutiny.

mathematical nicety or because in practice it results in some inequality.'" *Id*. at 321

(quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). But, even under this most

deferential standard, the "State may not rely on a classification whose relationship to the

asserted goal is so attenuated as to render the decision arbitrary or irrational." *Cleburne*,

473 U.S. at 446. For this reason, courts "insist on knowing the relation between the

classification adopted and the object to be attained." *Romer*, 517 U.S. at 632; *see also*

*Heller*, 509 U.S. at 321 (explaining the classification must "find some footing in the

realities of the subject addressed by the legislation").

      Strict scrutiny lies at the other end of the spectrum. This level of scrutiny applies

when a legislative classification "impermissibly interferes with the exercise of a

fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd.*

*of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). Such classifications are presumed

unconstitutional and will survive strict scrutiny only when the government can show the

law is narrowly tailored to a compelling governmental interest. *See Zablocki*, 434 U.S. at

388.

      "Between the extremes of rational basis review and strict scrutiny lies a level of

intermediate scrutiny, which generally has been applied to discriminatory classifications

based on sex or illegitimacy." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). These

classifications are considered "quasi-suspect," and survive heightened constitutional

scrutiny only if the State shows the classification is "substantially related to an important

governmental objective." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982).

Discrimination against a quasi-suspect class, such as women, must be supported by an

"exceedingly persuasive justification" and "not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The purpose of this heightened level of scrutiny is to ensure quasi-suspect classifications do not perpetuate unfounded stereotypes or second-class treatment. *Id.* at 534.

The Court's principal tasks here are to determine the form of discrimination at issue and next identify and apply the appropriate level of scrutiny.

### 1.   *Form of Discrimination*

Plaintiffs argue that Idaho's Marriage Laws discriminate against individuals on the basis of sex and sexual orientation. The Defendants counter that Idaho's Marriage Laws do not prefer one sex over the other, nor do they target gay and lesbian persons.

A person's gender and sexual orientation are two sides of the same coin. As one court aptly observed, "sex and sexual orientation are necessarily interrelated, as an individual's choice of romantic or intimate partner based on sex is a large part of what defines an individual's sexual orientation." *Perry v. Schwarzenegger*, 704 F.Supp.2d 921, 996 (N.D. Cal. 2010). However, the Supreme Court has not equated sexual orientation discrimination and sex discrimination despite several opportunities to do so. *See Romer*, 517 U.S. at 635 ("We must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else."); *Lawrence*, 539 U.S. at 583 (O'Connor, J., concurring) ("[T]he conduct targeted by this law is conduct that is closely correlated with being homosexual."); *Windsor*, 133 S. Ct. at 2695 ("The class to which DOMA directs its restrictions and restraints are those persons who are joined in same-sex marriages made lawful by the State."). Considering the Supreme

Court's treatment of this issue, this Court finds that sex discrimination and sexual orientation discrimination are "distinct phenomena." *In re Marriage Cases*, 183 P.3d 384, 439 (Cal. 2008); *see also Bishop v. U.S.*, 962 F.Supp.2d 1252 (N.D. Okla. 2014) ("Common sense dictates that the intentional discrimination occurring in this case has nothing to do with gender-based prejudice or stereotypes, and the law cannot be subject to heightened scrutiny on that basis.").

Idaho's Marriage Laws allow heterosexuals, but not homosexuals, to marry and thus clearly discriminate on the basis of sexual orientation. This distinction does not prefer one gender over the other—two men have no more right to marry under Idaho law than two women. In other words, Idaho's Marriage Laws are facially gender neutral and there is no evidence that they were motivated by a gender discriminatory purpose. *See In re Kandu*, 315 B.R. 123, 143 (Bankr. W.D. Wash. 2004) ("The test to evaluate whether a facially gender-neutral statute discriminates on the basis of sex is whether the law can be traced to a discriminatory purpose.") (internal quotations omitted).

### 2. *Level of Scrutiny*

Plaintiffs advance two reasons for applying heightened scrutiny to Idaho's Marriage Laws. First, they argue sexual orientation is subject to heightened scrutiny under recent precedent of the United States Court of Appeals for the Ninth Circuit. Second, they claim that classifications based on sexual orientation are constitutionally suspect.

### a. *Ninth Circuit Precedent*

Plaintiffs first argue that heightened scrutiny applies to sexual orientation discrimination by virtue of the Ninth Circuit's recent decision in *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 484 (9th Cir. 2014). The Defendants claim *SmithKline* is distinguishable on its facts. The State and Recorder Rich argue *SmithKline* is a case about discriminatory jury selection and, as such, its holding is limited to cases involving intentional sexual orientation discrimination based on stereotypes. In a similar vein, Governor Otter claims *SmithKline* is inapplicable because Idaho's Marriage Laws are not motivated by animus toward homosexuals. Defendants misread the case.

*SmithKline* involved a constitutional challenge to a preemptory strike of a prospective juror during jury selection for a trial between two pharmaceutical companies, SmithKline Beecham and Abbott Laboratories. The parties' dispute centered on the pricing of HIV medications, which is "a subject of considerable controversy in the gay community." *Id*. at 474. During the jury selection process, Juror B was the only self-identified gay member of the jury pool. Immediately after Abbott exercised its first peremptory strike against Juror B, SmithKline's counsel raised a *Batson* challenge that the trial judge denied.[11]  The Ninth Circuit concluded that Abbott's challenge amounted

---

[11]     In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court found that the Equal Protection Clause limits the privilege of exercising peremptory strikes when selecting a jury. Although *Batson* considered strikes based on race, its underlying constitutional principle now extends to classes of persons subject to intermediate or strict equal protection scrutiny. *J.E.B. v. Alabama*, 511 U.S. 127, 143 (1994) ("Parties may . . . exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review.").

to purposeful sexual orientation discrimination before answering the dispositive question: Whether classifications based on sexual orientation are subject to heightened scrutiny.

To answer this question, the Ninth Circuit looked to the Supreme Court's equal protection analysis in *Windsor*. Although *Windsor* does not announce the level of scrutiny, the *SmithKline* court considered what the Supreme Court "actually did" and determined the Supreme Court's analysis was inconsistent with pure rational basis review. *Id.* at 481. *SmithKline*'s examination of *Windsor* is authoritative and binding upon this Court.

According to *SmithKline*, *Windsor*'s constitutional analysis exhibits none of the hallmarks of rational basis review. First, the Supreme Court ignored the hypothetical justifications for the Defense of Marriage Act and instead carefully considered the law's actual purpose. *Id.* at 481-82 (citing *Windsor*, 133 S. Ct. at 2693-94). Second, "the critical part of *Windsor* begins by demanding that Congress's purpose '*justify* disparate treatment of the group.'" *Id.* at 482 (quoting *Windsor*, 133 S. Ct. at 2693). Wholly inconsistent with rational basis review, this demand neither defers to legislative choices nor presumes a law is constitutional. *Compare Williamson v. Lee Optical,* 348 U.S. 483, 487 (1955) ("[I]t is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement.") *with Windsor*, 133 S. Ct. at 2696 ("The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and injure those whom the State, by its marriage laws, sought to protect in personhood and dignity."). Concluding its analysis, the Ninth Circuit held that "*Windsor* requires that when state action discriminates on the basis of sexual orientation, we must examine its actual

purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline*, 740 F.3d at 483.

This holding is unqualified and logically preceded the court's analysis of the *Batson* challenge. Indeed, the *Batson* analysis otherwise would have been foreclosed because the Ninth Circuit's pre-*Windsor* equal protection precedent held that sexual orientation discrimination is subject to rational basis review. *See High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990), *abrogation recognized by SmithKline*, 740 F.3d at 483. Reexamining its precedent in light of *Windsor*, the *SmithKline* court found that "earlier cases applying rational basis review to classifications based on sexual orientation cannot be reconciled with *Windsor*." 740 F.3d at 483. Only after the Ninth Circuit found Juror B belonged to a group subject to heightened scrutiny did it then proceed with its *Batson* analysis. In this Court's view, *SmithKline* establishes a broadly applicable equal protection principle that is not limited to the jury selection context.

Also, contrary to Defendants' contentions, *SmithKline* does not limit the application of heightened scrutiny to instances of proven animus or irrational stereotyping. *SmithKline* addresses purposeful discrimination and the perpetuation of impermissible stereotypes, but it does so in the context of the *Batson* analysis—not in the discussion about *Windsor*. *Id*. at 484-86. With respect to *Windsor*, the court's holding is undeniably broad: "*Windsor's* heightened scrutiny applies to classifications based on sexual orientation." *Id*. at 483. Had the Ninth Circuit intended to limit its holding to cases

involving animus or irrational stereotyping, it easily could have done so. Instead, it found *Windsor* to be "dispositive of the question of the appropriate level of scrutiny in this case," a case that fits into the broader category of "classifications based on sexual orientation." *Id.* at 480. Just as the Ninth Circuit was "bound by [*Windsor*'s] controlling, higher authority" when deciding *SmithKline*, this Court is bound to apply *Windsor*'s heightened scrutiny to Idaho's Marriage Laws.[12]

### b.   *Suspect class*

Apart from *SmithKline*, Plaintiffs also contend Idaho's Marriage Laws are subject to heightened scrutiny because classifications based on sexual orientation are constitutionally suspect. The Court need not dissect this argument because the Supreme Court has accepted it by implication. If homosexuals are not a suspect or quasi-suspect class, the Supreme Court would have applied rational basis scrutiny in *Windsor*. But, as recognized in *SmithKline*, the Supreme Court applied heightened scrutiny. Indeed, the Supreme Court affirmed the Second Circuit without questioning (or even discussing) the lower court's express holding:

> A) homosexuals as a group have historically endured persecution and discrimination; B) homosexuality has no relation to aptitude or ability to contribute to society; C) homosexuals are a discernible group with non-obvious distinguishing characteristics, especially in the subset of those who enter same-sex marriages; and D) the class remains a politically weakened minority.

---

[12]   Currently, Nevada's laws prohibiting same-sex marriage are before the Ninth Circuit and Oregon's are before the District of Oregon. The Attorneys General of Nevada and Oregon both recently concluded that heightened scrutiny under *SmithKline* eviscerates the legal bases for their defenses. (Dkt. 77-2 at 5; Dkt. 77-3 at 22.) Consequently, both Attorneys General have refused to defend their state's marriage laws.

*Windsor v. United States*, 699 F.3d 169, 181-82 (2d Cir. 2012), *aff'd United States v. Windsor*, 133 S. Ct. 2675 (2013). The Second Circuit's holding was both approved and essential to the scrutiny the Supreme Court applied in *Windsor*. Had the Supreme Court disagreed with the Second Circuit, it would not have applied heightened scrutiny. It is not necessary to repeat the Second Circuit's analysis, for that analysis is implicit in both *Windsor* and *SmithKline*.

**D.     Idaho's Marriage Laws Fail Constitutional Scrutiny**

Because Idaho's Marriage Laws impermissibly infringe on Plaintiffs' fundamental right to marry, the Laws are subject to strict due process and equal protection scrutiny. But *SmithKline* directs the Court to apply heightened equal protection scrutiny to laws that discriminate on the basis of sexual orientation. Idaho's Marriage Laws do not withstand this heightened scrutiny.

At a minimum, the Court must examine Idaho's Marriage Laws "and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline*, 740 F.3d at 483. Based on *Windsor*, and as explained in *SmithKline*, four principles guide the Court's equal protection analysis. The Court (1) looks to the Defendants to justify Idaho's Marriage Laws, (2) must consider the Laws' actual purposes, (3) need not accept hypothetical, *post hoc* justifications for the Laws, and (4) must decide whether the Defendants' proffered justifications overcome the injury and indignity inflicted on Plaintiffs and others like them. *See id.* at 481-83.

**MEMORANDUM DECISION AND ORDER - 36**

These principles most closely correspond to the intermediate scrutiny test applied to quasi-suspect classifications based on gender and illegitimacy. *See Windsor v. United States*, 699 F.3d 169, 185-88 (2d Cir. 2012) (applying intermediate scrutiny). In those cases "the burden of justification is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). While intermediate scrutiny permits classifications designed to remedy economic injuries or promote equality, the test focuses on "differential treatment" and "denial of opportunity" to ensure that discriminatory laws do not "create or perpetuate the legal, social, and economic inferiority" of the affected class. *Id.* at 533-34.

## 1.    *The Actual Purpose of Idaho's Marriage Laws*

The Court begins its inquiry into the actual purpose of Idaho's Marriage Laws by examining their text. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 926 (9th Cir. 2004). "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). The meaning of Idaho's Marriage Laws could not be plainer.

The only recognized domestic legal union in Idaho is a "marriage between a man and a woman." Idaho Const. Art. III, § 28. A marriage can be licensed and solemnized only if it is "a civil contract between a man and a woman. . . ." Idaho Code § 32-201. All marriages contracted outside of Idaho are valid in Idaho except marriages that violate Idaho's public policy. *Id.* § 32-209. The statutory list of marriages that violate Idaho's public policy is nonexclusive, but it specifically identifies only two categories—"same-

sex marriages, and marriages entered into . . . with the intent to evade the prohibitions of" Idaho's Marriage Laws. *Id.* The parties do not cite, and the Court does not find, a published Idaho case holding that anything other than same-sex marriage violates the public policy set forth in Idaho Code § 32-209. Each of these laws unambiguously expresses a singular purpose—to exclude same-sex couples from civil marriage in Idaho.

The Laws' legislative history makes their exclusionary purpose even clearer. Idaho Code Sections 32-201 and 32-209 were both amended in the mid-1990's, at a time when no state recognized same-sex marriage. In 1993, however, the Hawaii Supreme Court became the first court in the country to strike down a statutory same-sex marriage ban. *Baehr v. Lewin*, 852 P.2d 44, 61 (Haw. 1993) (remanding for consideration of justifications for the ban). After *Baehr*, over half of the states passed laws prohibiting same-sex marriage. *See Bourke v. Beshear*, 2014 WL 556729, at *1 n.1 (W.D. Ken. Feb. 12, 2014) (listing laws). In addition, the United States Congress reacted in 1996 by passing the Defense of Marriage Act—the law found partially unconstitutional in *Windsor*. The present versions of Sections 32-201 and 32-209 also took effect in 1996.

The Idaho Legislature amended § 32-201 in 1995 to add, among other language, the words "between a man and a woman." 1995 Idaho Sess. Laws, ch. 104, § 3. In addition to this definitional change, the 1995 amendment abolished common law marriage. *Id.* §§ 3-5. Indeed, abolition of common law marriage appears to be the amendment's primary purpose, as its legislative history does not include a single direct reference to the "between a man and a woman" provision. The Compiler's Notes for the 1995 amendment do, however, include the following:

**MEMORANDUM DECISION AND ORDER - 38**

> It is the intent of this act to promote the stability and best interests of marriage and the family. Marriage is the institution that is the foundation of the family and of society. Its stability is basic to morality and civilization and of vital interest to society and the state. Common-law marriages entered into in this state on and after January 1, 1996, will no longer be recognized.

1995 Idaho Sess. Laws, ch. 104, § 1. The stated intent and apparent purpose of the amendment to Idaho Code § 32-201 was to promote family stability, morality, and a traditional view of the marriage institution.

Section 32-201's man-woman marriage definition took effect on January 1, 1996. A few months later, the Idaho Legislature amended § 32-209 to include a public policy against same-sex and evasive marriages. 1996 Idaho Sess. Laws, Ch. 331, § 1. From Idaho's territorial days until the amendment's approval in 1996, Idaho law codified the long-established "place of celebration rule," whereby "[a]ll marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted, are valid in this state." Idaho Code Ann. § 32-209 (1983); *see also Hilton v. Stewart*, 96 P. 579, 583 (Idaho 1908) ("This statute merely announces the general rule of law, as we understand it, that any contract which is a valid marriage according to the law of the place where the contract is made is valid everywhere.").

But in 1996, the Legislature ended Idaho's tradition of comity toward out-of-state marriages. At the time, Speaker of the House Simpson voiced his concern that Hawaii might recognize same-sex marriages and leave Idaho with no choice but to reinforce its current policy or recognize same-sex marriage by default. *Relating to Recognition of Foreign Marriages: Minutes for Feb. 15, 1996 Meeting on H.B. 658 Before the H.*

**MEMORANDUM DECISION AND ORDER - 39**

*Judiciary, Rules, & Admin. Comm.*, 53d Legis. Sess., 2d Reg. Sess. 2 (Idaho 1996).

According to Representative William Sali, there was no time to delay or study the matter

because Hawaii would dictate Idaho's marriage policy if the Legislature did not act. *Id.*

Despite opposition from religious leaders, civil liberties advocates, and both homosexual

and heterosexual citizens, the bill easily passed the House and Senate before arriving on

Governor Batt's desk.

   With the Governor's signature, the law took immediate effect on March 18, 1996.

This swift transition from bill to governing law was due to a legislative declaration of

emergency that accompanied the substantive changes to § 32-209. 1996 Idaho Sess.

Laws, Ch. 331, § 2. The Legislature's sense of urgency was vindicated when, later that

year, a Hawaii trial court rejected every proffered justification for Hawaii's same-sex

marriage ban and enjoined Hawaii from denying marriage license applications solely

because of the applicants' sexual orientation. *Baehr v. Miike*, 1996 WL 694235 (Haw.

Cir. Ct. Dec. 3, 1996), *superseded by statute*, Haw. Rev. Stat. § 572-1 (1998). Thus, the

purpose of the 1996 amendment to Idaho Code § 32-209 was to buttress Idaho's

traditional definition of marriage against changes in other states' marriage laws.

   By 2003, the highest courts in Vermont and Massachusetts had ruled that their

respective state constitutions precluded the denial of marriage benefits on the basis of

sexual orientation. *Baker v. State*, 744 A.2d 864 (Vt. 1999); *Goodridge v. Dep't of Pub.

Health*, 798 N.E.2d 941 (Mass. 2003). These developments again prompted legislative

reactions across the country. This time, however, the Idaho Legislature sought to place on

the ballot a proposed amendment to the Idaho Constitution that would prevent an Idaho

court from reaching a result similar to those in Vermont and Massachusetts. Efforts to do

so in 2004 and 2005 failed to garner the necessary two-thirds majority in the Idaho

Senate. But, in 2006, a third measure was introduced in the House, debated, and this time

passed both chambers. H.R.J. Res. 2, 58th Leg., 2d Reg. Sess. (Idaho 2006). The

legislative approval allowed the following question to appear on the November 2006

general election ballot:

> Shall Article III, of the Constitution of the State of Idaho be amended by
> the addition of a new Section 28, to provide that a marriage between a man
> and a woman is the only domestic legal union that shall be valid or
> recognized in this state?

(Dkt. 57-8 at 2.)

The public debate over the proposal, which became known as Amendment 2,

centered on tradition, family, and equality. *See generally* (Dkt. 57-4; Dkt. 57-7 at 6-16,

18-20, 35; Dkt. 57-8 at 5, 42-128.) Supporters of the amendment argued that traditional

marriage between a man and a woman formed a foundation for stable and nurturing

families. Both sides debated the relative quality of opposite-sex versus same-sex

parenting. Those opposed to the amendment emphasized that same-sex couples could be

just as loving and committed to each other and their children as opposite-sex couples.

Some framed the debate in explicitly religious terms, but faith leaders spoke out on both

sides. Others characterized the matter as a secular issue, often citing the need for equality

among citizens.

On November 7, 2006, Idaho's electorate took to the ballot box, and 63.3% voted

in favor of Amendment 2. (Dkt. 57-8 at 8.) The amendment immunized Idaho's man-

**MEMORANDUM DECISION AND ORDER - 41**

woman marriage definition from attack in the State's courts or legislative bodies. As a result, nothing short of a successful federal constitutional challenge or a superseding amendment to Idaho's Constitution would be sufficient to change Idaho's Marriage Laws.

Because over 280,000 Idahoans voted for Amendment 2, it is not feasible for the Court to infer a particular purpose or intent for the provision. But, as Plaintiffs argue, it is obvious that Idaho's Marriage Laws purposefully discriminate on the basis of sexual orientation. Suggesting that the laws' discriminatory effects are merely incidental, Defendants characterize them as efforts to preserve Idaho's traditional civil marriage institution. "But 'preserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples." *Lawrence*, 539 U.S. at 601 (Scalia, J., dissenting). Although the Court finds Idaho's Marriage Laws were motivated, in part, by important governmental interests, their history demonstrates that moral disapproval of homosexuality was an underlying, animating factor. As with DOMA, the "practical effect" of Idaho's Marriage Laws is "to impose a disadvantage, a separate status, and so a stigma" on a class of people based solely on their sexual orientation. *Windsor*, 133 S. Ct. at 2693. The question now is whether any of the Defendants' asserted justifications overcome the inequality imposed upon Plaintiffs and others like them.

### 2.      *Asserted Justifications for Idaho's Marriage Laws*

All Defendants assert that Idaho's Marriage Laws relate to the State's interest in maximizing child welfare but differ on how the means—denying marital status to same-

sex couples—serve this child-welfare end. Governor Otter primarily contends the definition fosters a traditional, child-centric marriage culture and otherwise promotes optimal family structures. The State and Recorder Rich claim the definition allows Idaho to channel its limited fiscal resources toward naturally procreative relationships.

Aside from child welfare, the Governor and amicus curiae Cornerstone Family Council of Idaho assert Idaho's Marriage Laws serve additional, important interests. They maintain that the Laws further the State's interest in federalism. Governor Otter also claims Idaho's Marriage Laws serve the State's interests in accommodating religious freedom, avoiding civic strife, and affirming democratic consensus. The Court addresses each asserted justification below.

### a.   *Child Welfare*

Governor Otter contends that Idaho's Marriage Laws advance the State's interest in protecting children. Children are indeed both vulnerable and essential to the perpetuation of society. And, although the Court agrees that the State has a compelling interest in maximizing child welfare, the link between the interest in protecting children and Idaho's Marriage Laws is so attenuated that it is not rational, let alone exceedingly persuasive.

Governor Otter observes that man-woman marriage is an ancient and traditional "child-centered institution, one focused first and foremost on the welfare of children

rather than the emotional interests of adults." [13] (Dkt. 57-2 at 10.) The Governor emphasizes this "conjugal" view of marriage encourages "parents to routinely sacrifice their own interests to the legitimate needs and interests of their children." (*Id.*) And, the Governor asserts, Idaho's Marriage Laws reinforce this traditional, child-centric norm by offering marital status only to couples with the natural capacity to procreate.

The Governor claims that recognizing same-sex marriages would radically redefine the institution by imposing a "consent-based" marriage regime. Without the normative guidance of traditional marriage, the Governor fears that the social institution of marriage will erode. This deinstitutionalization of marriage could cause parents to turn away from the self-sacrifice that, the Governor asserts, is a hallmark of Idaho's traditional, child-centric regime.

The Governor also claims that Idaho's Marriage Laws further the State's interest in child-welfare by promoting optimal family structures. Citing to volumes of sociological studies, the Governor advances the general proposition that two parents in a low-conflict marriage constitute the optimal child-rearing environment. *See generally* (Dkt. 57-8 at 103-128; 57-9 through 57-11 at 150.) Plaintiffs do not dispute this general conclusion. (Lamb Dec., Dkt. 47 ¶¶ 17-20.) But the Governor further argues that children

---

[13]     The Governor does not argue that Idaho's Marriage Laws advance traditional marriage for tradition's sake alone. But it bears repeating that the "[a]ncient lineage of a legal concept does not give it immunity from attack for lacking a rational basis." *Heller v. Doe,* 509 U.S. 312, 326 (1993). Moreover, "'the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack.'" *Lawrence v. Texas,* 539 U.S. 558, 577–78 (2003) (quoting *Bowers v. Hardwick,* 478 U.S. 186, 216 (1986) (Stevens, J., dissenting)).

uniquely benefit from parental gender "complementarity"—that is, parenting by parents of the opposite sex. (Dkt. 90 at 3.) Plaintiffs counter by emphasizing the broad consensus among sociological experts that gender of the two parents makes no difference for a child's well-being. (Lamb Dec., Dkt. 47 ¶¶ 32-36.) Thus, the parties fundamentally disagree on whether same-sex parenting negatively affects a child's well-being.[14]

The best that can be said for Defendants' position is that some social scientists quibble with the prevailing consensus that the children of same-sex parents, on average, fare no better or worse than the children of opposite-sex parents. (*Id.* ¶¶ 35-41.) But the Court need not—even if it could at the summary judgment stage—resolve this sociological debate. The parties' debate over the scientific literature distracts from the essential inquiry into the logical link between child welfare and Idaho's wholesale prohibition of same-sex marriage. That link is faulty for at least four reasons.

First, civil marriage in Idaho is and has long been a designedly consent-based institution. The law speaks of marriage as a "civil contract . . . to which the consent of parties capable of making it is necessary." Idaho Code 32-201. True, "throughout human history and across many cultures, marriage has been viewed as an exclusively opposite-sex institution and as one inextricably linked to procreation and biological kinship." *Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting). But Idaho law is wholly indifferent to whether a heterosexual couple wants to marry because they share this vision or simply

---

[14]    Two federal district courts have held bench trials that focused on this question. *Perry v. Schwarzenegger*, 704 F.Supp.2d 921 (2010); *DeBoer v. Snyder*, 2014 WL 1100794 (E.D. Mich. March 21, 2014). Both found that the overwhelming scientific consensus favors the "no differences" view.

**MEMORANDUM DECISION AND ORDER - 45**

seek a tax break. That such a crass objective would be sufficient to obtain a marriage license does not mean marriage is a cheap convenience. Instead, it means that the value of marriage derives from a place beyond the law's reach.

Important as the child-centered vision of marriage is, Idaho's consent-based marriage regime does not require heterosexual couples to accept or follow this norm. Whatever the beliefs or intentions of the parties, there is nothing conjugal or child-centric about the formality of obtaining a marriage license. The Governor offers only conjecture to support his critical point—that allowing Plaintiffs or people like them to marry risks vitiating the child-centered norm. There is no evidence that allowing same-sex marriages will have any effect on when, how, or why opposite-sex couples choose to marry.

Second, Idaho does not condition marriage licenses or marital benefits on heterosexual couples' ability or desire to have children. No heterosexual couple would be denied the right to marry for failure to demonstrate the intent to procreate. Indeed, as the State and Recorder Rich observe, "[a]ttempting to restrict civil marriage to couples who intend to have children would demand governmental inquiry into sensitive matters of personal privacy and raise insuperable, or at a minimum very significant, privacy-based constitutional concerns." (Dkt. 73 at 17.) To claim that civil marriage is somehow tied to a governmental interest in procreation is to "threaten the legitimacy of marriages involving post-menopausal women, infertile individuals, and individuals who choose to refrain from procreating." *Bostic v. Rainey*, 970 F.Supp.2d 456, 478-79 (E.D. Va. 2014).

Third, Idaho does not withhold marriage licenses from heterosexual couples who might be, or are, non-optimal parents. Under Idaho law, everyone from multiple

divorcees, "dead-beat dads," *see Zablocki*, 434 U.S. 374, to prison inmates, *see Turner v. Safley*, 482 U.S. 78 (1987), may marry, as long as they marry someone of the opposite sex. Yet Plaintiffs—six of whom have children or step-children—are deemed unworthy of marital benefits because they *might* be less fit parents according to an inconclusive body of scientific literature. To the extent this amounts to a presumption of parental unfitness, it bears emphasis that a similar presumption was found unconstitutional over 40 years ago. *Stanley v. Illinois*, 405 U.S. 645 (1972) (holding due process entitles unwed fathers to a hearing before they could be deemed unfit parents). Constitutionality aside, "sexual orientation [is] wholly irrelevant" to whether a person can adopt children in Idaho. *In re Adoption of Doe*, —P.3d—, 2014 WL 527144, at *6 (Idaho February 10, 2014). In a state where the privilege of becoming a child's adoptive parent does not hinge on a person's sexual orientation, it is impossible to fathom how hypothetical concerns about the same person's parental fitness possibly could relate to civil marriage.

Finally, and most importantly, the Governor's child welfare rationales disregard the welfare of children with same-sex parents. It is undisputed that "poverty and social isolation [are] associated with maladjustment [in children], and adequate resources support[] healthy adjustment." (Lamb Dec., Dkt. 47 ¶ 18.c.) It is also clear that "[m]arriage can yield important benefits for children and families, including state and federal legal protections, economic resources, family stability, and social legitimacy. These benefits are equally advantageous for children and adolescents in families headed by same-sex and different-sex couples." (*Id.* ¶ 48.) Although the State and Recorder Rich dismiss same-sex households as "statistically insignificant," (Dkt. 73 at 12 n.3), no

**MEMORANDUM DECISION AND ORDER - 47**

Defendant suggests that the State's child welfare interest does not extend to the children in these households.

In this most glaring regard, Idaho's Marriage Laws fail to advance the State's interest because they withhold legal, financial, and social benefits from the very group they purportedly protect—children. As Justice Kennedy observed, a law that withdraws these benefits "humiliates . . . children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Windsor,* 133 S. Ct. at 2694. Failing to shield Idaho's children in any rational way, Idaho's Marriage Laws fall on the sword they wield against same-sex couples and their families.

> **b.** *Focusing Governmental Resources on Couples with Biological Procreative Capacity*

The State and Recorder Rich articulate a somewhat different link between child welfare and Idaho's prohibition of same-sex marriage. They propose that Idaho's interest in child welfare is served by directing the State's limited resources to opposite-sex couples. The State is justified in reserving marital benefits for these couples, the argument continues, because only they have the natural ability to procreate. Pointing to the public costs of divorce, single parenting, and tax breaks for married couples, Recorder Rich and the State argue that the State can avoid some of these costs by not allowing same-sex couples to marry.

Even in rational basis cases, the Supreme Court has rejected the argument that cost-cutting is a sufficient reason for denying benefits to a discrete group. *Plyler v. Doe*, 457 U.S. 202, 229 (1982) (invalidating a Texas statute that denied free public education to children of undocumented immigrants). When Arizona threatened to deny health care benefits to the same-sex domestic partners of state employees, the Ninth Circuit affirmed the district court's rejection of the Arizona's cost-saving rationale. *Diaz v. Brewer*, 656 F.3d 1008, 1013 (9th Cir. 2011). In both cases, the chief constitutional problem was that the states' attempts to cut costs fell on an arbitrarily selected group.

Because heightened scrutiny applies here, the Court must focus on the Laws' actual purposes. The Court finds that defending the State's fiscal resources is not an actual purpose of any law challenged in this case. Aside from the cost of putting Amendment 2 on the ballot, (Dkt. 57-7 at 3), the record indicates that the only public costs referenced during the debate over the measure were the cost of defending it in litigation, (Dkt. 57-8 at 5), and the cost of driving businesses away from Idaho with a State-approved message of intolerance. (*Id*. at 74.)

Even assuming cost-cutting was an actual purpose for Idaho's Marriage Laws, the State and Rich do not explain how avoiding the public cost of same-sex marriages improves child welfare. The Laws do not create new benefits for naturally procreative couples; instead, they arbitrarily withhold benefits from a "statistically insignificant" class of households with children. (Dkt. 73 at 12 n.3.) There is no showing that forbidding same-sex marriages makes naturally procreative couples more likely to marry, let alone stay married. Nor is there any evidence that the State has any compunction

**MEMORANDUM DECISION AND ORDER - 49**

about expending its limited resources on non-procreative or unstable heterosexual
marriages.

Defendants' only explanation is that a law "does not offend the Constitution
simply because the classification is not made with mathematical nicety or because in
practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)
(internal quotation omitted). While this may be the case when a court reviews economic
legislation under the rational basis standard, *e.g., U.S. R.R. Retirement Bd. v. Fritz*, 449
U.S. 166, 174 (1980), more precision is necessary where, as here, the law discriminates
on the basis of sexual orientation. *See SmithKline*, 740 F.3d at 481-82. If Idaho's
Marriage Laws seek to improve child welfare by focusing limited public resources on
heterosexual marriages, they do so in a patently arbitrary manner. They are at once
grossly overinclusive—by expending the State's limited resources on unstable marriages
and married couples with no intent or ability to procreate—and dramatically
underinclusive—by denying those resources to children whose parents happen to be
homosexual. The burden of this imprecision falls on families that seek the same stability
that Idaho claims to incentivize. This is not fiscal prudence; it is a State-endorsed
message of unworthiness that does not withstand constitutional scrutiny.

      **c.**    ***Federalism***

Governor Otter and amicus curiae Cornerstone Family Council of Idaho claim that
federalism principles require the Court to uphold the State's traditional authority to define
marriage. Defendants also make two more specific state's rights arguments. In particular,
Governor Otter claims that Idaho's policy against recognizing out-of-state same-sex

marriages must be accepted under the well-established public policy exception to the Full Faith and Credit Clause. *See Nevada v. Hall*, 440 U.S. 410, 422 (1979). Defendants also claim that Section 2 of the federal Defense of Marriage Act, codified at 28 U.S.C. § 1738C, authorizes Idaho to refuse recognition of same-sex marriages. All of these arguments fail to consider that "neither Congress nor a State can validate a law that denies the rights guaranteed by the Fourteenth Amendment." *Saenz v. Rowe*, 526 U.S. 489, 508 (1999).

It is true federalism favors preserving a state's right to choose policies uniquely suited to the preferences of its citizens. By creating a system with both state and federal governments, the "Framers [of the Constitution] thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant bureaucracy." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2578 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)). Thus, "a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). *Windsor* upheld this principle by invalidating the federal man-woman marriage definition, in part, because of its "unusual deviation" from the federal government's usual deference to state domestic relations laws. 133 S. Ct. at 2693.

However, "States are not the sole intended beneficiaries of federalism." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011). Federalism has another dimension, one that

**MEMORANDUM DECISION AND ORDER - 51**

"secures to citizens the liberties that derive from the diffusion of sovereign power."

*Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting).

> Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power. When government acts in excess of its lawful powers, that liberty is at stake.

*Bond*, 131 S. Ct. at 2364 (citation omitted). Federalism is not just a bulwark against federal government overreach; it is also an essential check on state power.

For that reason, "federalism" is no answer where, as here, individuals claim their state government has trampled their constitutional rights. Indeed, *Windsor* also recognizes the transcendent quality of individual constitutional rights, even when those rights conflict with a state's traditional sovereign authority. "State laws defining and regulating marriage, of course, *must respect the constitutional rights of persons*, see, *e.g., Loving*. . . ." *Windsor*, 133 S. Ct. at 2691 (emphasis added). As other courts have recognized, *Windsor*'s citation to *Loving* for this proposition "is a disclaimer of enormous proportions." *Bishop v. U.S.*, 962 F.Supp.2d 1252, 1279 (N.D. Okla. 2014). In *Loving*, Virginia's sovereign authority over marital relations could not save the State's anti-miscegenation laws. And, just as in *Loving*, Idaho's right to regulate domestic relations is subject to the paramount rights of its citizens. That is the way of our federal system.

### d. *Accommodating Religious Freedom, Avoiding Civic Strife, and Assuring Social Consensus*

Finally, Governor Otter argues that Idaho's Marriage Laws should be upheld because they serve the related goals of supporting religious liberty, avoiding the potential

**MEMORANDUM DECISION AND ORDER - 52**

for religion-centered conflicts, and affirming a prevailing social consensus on marriage. Analogizing to the Supreme Court's days-old decision in *Schuette v. BAMN*, 134 S. Ct. 1623 (2014), the Governor argues that "a state's voters *can* ban preferences" and that courts should "let[] the people make difficult policy choices through democratic means." (Dkt. 93 at 2.) Yet the Governor acknowledges, as he must, this "is not to say the State can invoke concerns about religious freedom or religion-related social strife as a basis for denying rights otherwise guaranteed by the Constitution." (Dkt. 57-2 at 53.)

The Governor's argument concerning religious liberty is myopic. No doubt many faiths around the world and in Idaho have longstanding traditions of man-woman marriage rooted in scripture. But not all religions share the view that opposite-sex marriage is a theological imperative. In fact, some of the Plaintiffs actively worship in faiths that recognize and support their unions. (S. Watsen Dec. ¶ 13, Dkt. 51.) To the extent Governor Otter argues that Idaho has a legitimate interest in validating a particular religious view of marriage, that argument blithely disregards the religious liberty of congregations active in Idaho. "By recognizing the right to marry a partner of the same sex, the State allows these groups the freedom to practice their religious beliefs without mandating that other groups must adopt similar practices." *Kitchen v. Herbert*, 961 F.Supp.2d 1181, 1214 (D. Utah 2013).

Likewise, a desire to protect or maintain a particular social consensus does not withstand constitutional scrutiny. "A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas v. Forty-Fourth Gen. Assembly of Colo.*, 377 U.S. 713, 736-37 (1964). The Supreme Court's

decision in *Schuette* says nothing to the contrary. Unlike this case, *Schuette* involved the Michigan electorate's vote to stop the racially discriminatory, albeit arguably beneficial, practice of affirmative action. 134 S. Ct. at 1630 ("The question here concerns not the permissibility of race-conscious admissions policies under the Constitution but whether, and in what manner, voters in the States may choose to prohibit the consideration of racial preferences in governmental decisions, in particular with respect to school admissions."). Far from establishing a state's right to violate the Fourteenth Amendment by majority vote, *Schuette* stands for the unremarkable proposition that voters can and should be allowed to end their state's discriminatory policies. That principle has no application in a case, like this one, where voters imposed a purposefully discriminatory policy that undermines a fundamental right.

Rather, the dispositive principle in this case is that "fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). The Supreme Court has endorsed this principle again and again. As Justice Robert Jackson so eloquently put it:

> The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to    assure that laws will be just than to require that laws be equal in operation.

*Railway Express Agency v. New York,* 336 U.S. 106, 112-113 (1949) (Jackson, J., concurring).

This principle resonates today, as 10 federal courts across the country have in recent months reached similar conclusions on the very issues present in this case.[15] Considering many of the same arguments and much of the same law, each of these courts concluded that state laws prohibiting or refusing to recognize same-sex marriage fail to rationally advance legitimate state interests. This judicial consensus was forged from each court's independent analysis of Supreme Court cases extending from *Loving* through *Romer*, *Lawrence*, and *Windsor*. The logic of these precedents virtually compels the conclusion that same-sex and opposite-sex couples deserve equal dignity when they seek the benefits and responsibilities of civil marriage. Because Idaho's Marriage Laws do not withstand any applicable form of constitutional scrutiny, the Court finds they violate the Fourteenth Amendment to the United States Constitution.

## V.   CONCLUSION

The Plaintiffs are entitled to extraordinary remedies because of their extraordinary injuries. Idaho's Marriage Laws withhold from them a profound and personal choice, one that most can take for granted. By doing so, Idaho's Marriage Laws deny same-sex

---

[15]    *Kitchen v. Herbert*, 961 F.Supp.2d 1181,  (D. Utah 2013); *Bishop v. U.S.*, 962 F.Supp.2d 1252 (N.D. Okla. 2014); *Bourke v. Beshear*, —F.Supp.2d—, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014); *Bostic v. Rainey*, 970 F.Supp.2d 456 (E.D. Va. 2014); *Lee v. Orr*, —F.Supp.2d—, 2014 WL 683680 (N.D. Ill. Feb 21, 2014); *De Leon v. Perry*, —F.Supp.2d—, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014); *Tanco v. Haslam*, —F.Supp.2d—,  2014 WL 997525 (M.D. Tenn. Mar. 14, 2014); *DeBoer v. Snyder*, —F.Supp.2d—, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014); *Henry v. Himes*, —F.Supp.2d—, 2014 WL 1418395 (S.D. Ohio Apr. 14, 2014); *Baskin v. Bogan*, —F.Supp.2d—, 2014 WL 1568884 (S.D. Ind. Apr. 18, 2014).

couples the economic, practical, emotional, and spiritual benefits of marriage, relegating each couple to a stigmatized, second-class status. Plaintiffs suffer these injuries not because they are unqualified to marry, start a family, or grow old together, but because of who they are and whom they love.

The Defendants offered no evidence that same-sex marriage would adversely affect opposite-sex marriages or the well-being of children. Without proof, the Defendants' justifications echo the unsubstantiated fears that could not prop up the anti-miscegenation laws and rigid gender roles of days long past. Then as now, it is the duty of the courts to apply the law to the facts in evidence. Here, the facts are clear and the law teaches that marriage is a fundamental right of all citizens, which neither tradition nor the majority can deny.

The Fourteenth Amendment guarantees of due process and equal protection lie at the core of our constitutional system. While the Supreme Court has not expressly decided the issues of this case, it has over the decades marked the path that leads to today's decision. "[T]he history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded." *United States v. Virginia*, 518 U.S. 515, 557 (1996). Slow as the march toward equality may seem, it is never in vain.

## ORDER

The Court **GRANTS** Plaintiffs' Motion for Summary Judgment (Dkt. 45).

Defendant Governor Otter's Motion for Summary Judgment (Dkt. 57) and Defendant

Recorder Rich and Defendant-Intervenor Idaho's Motions to Dismiss (Dkt. 30, 41, 43)

are **DENIED**.

The Court hereby **DECLARES** that Idaho's Marriage Laws are unconstitutional

because they violate Plaintiffs' rights under the Due Process and Equal Protection

Clauses of the Fourteenth Amendment to the United States Constitution.

The Court **PERMANENTLY ENJOINS** the State of Idaho and its officers,

employees, agents, and political subdivisions from enforcing Article III, § 28 of the Idaho

Constitution; Idaho Code Sections 32-201 and 32-209; and any other laws or regulations

to the extent they do not recognize same-sex marriages validly contracted outside Idaho

or prohibit otherwise qualified same-sex couples from marrying in Idaho. This injunction

shall take effect at 9:00 a.m. MDT on May 16, 2014.

**IT IS SO ORDERED.**

DATED: May 13, 2014.

CANDY WAGAHOFF DALE
CHIEF U.S. MAGISTRATE JUDGE